**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| GOLD COAST FLATS, LLC,<br>an Illinois limited company,<br><br>            Plaintiff,<br>      v.<br><br>SPRINTCOM LLC,<br>a Kansas limited liability company<br>f/k/a SPRINTCOM, INC.,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 23-cv-03842 |

## ANSWER TO COMPLAINT

Defendant SprintCom LLC, f/k/a SprintCom, Inc. ("Sprint" or "Tenant"), by its attorneys, hereby answers the complaint of Gold Coast Flats, LLC ("Gold Coast" or "Landlord") as follows:

1.     Landlord is an Illinois Limited liability company, with a principal place of business located at 908 North Halsted, Chicago, Cook County, Illinois 60622.

**ANSWER:**     Sprint admits that Gold Coast is an Illinois registered LLC. Sprint lacks knowledge or information sufficient to form a belief regarding the location of Gold Coast's "principal place of business" and therefore denies that allegation. Otherwise, denied.

2.     Tenant is a Kansas limited liability company f/k/a Sprintcom, Inc., which was at all relevant times authorized to do business in Illinois, with its principal office located in Bellevue, Washington, and maintains a registered office in Springfield, Sangamon County, Illinois.

**ANSWER:**     Sprint admits the allegations of this paragraph.

3.     On or about August 1, 1996, Sprintcom, Inc., was incorporated as a Kansas corporation.

**ANSWER:**     Sprint admits that SprintCom, Inc. was incorporated as a Kansas corporation on or about July 29, 1996.

4.      On or about December 23, 2021, SprintCom, Inc., filed a Certificate of Conversion with the Kansas Secretary of State.

**ANSWER:**   Sprint admits that on or about December 21, 2021, Sprintcom, Inc. filed a

Certificate of Conversion with the Kansas Secretary of State.

5.      On or about December 31, 2021, was the effective date of the conversion of Sprintcom, Inc. from a Kansas corporation to a Kansas limited liability company and is now known as Sprintcom LLC.

**ANSWER:**   Sprint admits the allegations of this paragraph.

6.      Landlord owns the property located at 1201 North Clark St., Chicago, Illinois 60610 (hereinafter referred to as the "Building"), which is further described as follows:

> PARCEL 1:
>
> LOTS 17, 18, AND 19 AND 20 (EXCEPT THE SOUTH 2 FEET OF SAID LOT 20) IN SOPHER'S SUBDIVISION OF LOT 30 IN BRONSON'S ADDITION TO CHICAGO, IN THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.
>
> PARCEL 2:
>
> THE SOUTH 23 FEET OF LOT 18 IN CHICAGO LAND CLEARANCE COMMISSION NO 3, BEING A CONSOLIDATION OF LOTS AND PARTS OF LOTS AND VACATED ALLEYS IN BRONSON'S ADDITION TO CHICAGO AND CERTAIN RESUBDIVISIONS, ALL IN THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

**ANSWER:**   Sprint lacks knowledge or information sufficient to form a belief regarding

whether Gold Coast currently owns the property located at 1201 North Clark St. beyond what

information is in publicly available property records. Otherwise, denied.

7.      On or about November 20, 2009, Landlord entered into a written lease ("Lease Agreement") with Clear Wireless LLC, a Nevada limited liability company (hereinafter "Original Tenant") to lease a portion of the commercial space located at the Building to Tenant (hereinafter referred to as the "Leased Premises"). (See Lease Agreement attached hereto as Exhibit 1.)

**ANSWER:**     Sprint admits that Gold Coast entered into the Lease Agreement on or about November 16, 2009 with Clearwire Communications, LLC. Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Otherwise, denied.

8.     The term of the Lease Agreement was for 10 years subject to extensions as set forth in Section 2.3. (See Lease Agreement attached hereto as Exhibit 1.)

**ANSWER:**     Sprint admits that the initial Lease term was for a period of 10 years subject to the extensions as set forth in Section 2.3 of the Lease Agreement. Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Otherwise, denied.

9.     On or about September 2011, the Lease Agreement was assigned by Original Tenant to Tenant ("Lease Assignment"). (See the Lease Assignment attached hereto as Exhibit 2.)

**ANSWER:**     Sprint admits that the Lease Agreement was assigned by Original Tenant to Tenant on or about September 9, 2011. Sprint refers to the Lease Assignment for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Assignment. Otherwise, denied.

10.     This Honorable Court has jurisdiction over the subject matter of this action and the parties hereto pursuant to §§5/2-209(a) and (b) of the Illinois Code of Civil Procedure (735 ILCS 5/2-209(a) and (b)), as the Lease Agreement was executed in Cook County, Illinois.

**ANSWER:**     When this allegation was written, the court being referenced was the Circuit Court of Cook County, Illinois. This action has since been removed to the U.S. District Court for the Northern District of Illinois. Sprint denies the allegations in this paragraph.

11.     This Honorable Court has jurisdiction over the subject matter of this action and the parties hereto pursuant to §§5/2-209(a) and (b) of the Illinois Code of Civil Procedure (735 ILCS 5/2-209(a) and (b)) as the Lease Premises is [sic] located in Cook County, Illinois.

**ANSWER:**     When this allegation was written, the court being referenced was the Circuit Court of Cook County, Illinois. This action has since been removed to the U.S. District Court for

3

the Northern District of Illinois. Sprint states that the U.S. District Court for the Northern District of Illinois has jurisdiction over this action. Sprint admits that the Leased Premises are located in Cook County, Illinois. Otherwise, denied.

12.     Venue is proper in Cook County, Illinois pursuant to 735 ILCS 5/2-101 as the Lease Agreement was negotiated and executed in Cook County.

**ANSWER:**     When this allegation was written, the court being referenced was the Circuit Court of Cook County, Illinois. This action has since been removed to the U.S. District Court for the Northern District of Illinois. Sprint states that venue is proper in the U.S. District Court for the Northern District of Illinois.  Otherwise, denied.

13.     Venue is proper in Cook County, Illinois pursuant to 735 ILCS 5/2-101 as the Leased Premises, which is the subject matter of this dispute, is located in Cook County, Illinois.

**ANSWER:**     When this allegation was written, the court being referenced was the Circuit Court of Cook County, Illinois. This action has since been removed to the U.S. District Court for the Northern District of Illinois. Sprint states that venue is proper in the U.S. District Court for the Northern District of Illinois.  Sprint admits that the Leased Premises are located in Cook County, Illinois. Otherwise, denied.

14.     The Lease Agreement was executed on behalf of Tenant by Jim Flyder ("Flyder").

**ANSWER:**     Sprint admits that the Lease Agreement was executed on behalf of Tenant by Jim Ryder ("Ryder"), not Flyder.  Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement.  Otherwise, denied.

15.     At all relevant times, Flyder was designated by Tenant as Tenant's Vice President of Sales and Marketing of Sprintcom, Inc.

**ANSWER:**     Sprint admits that Ryder's job title at the time of the Lease Agreement's execution was VP, Sales and Marketing.  Sprint otherwise refers to the Lease Agreement for its

complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Otherwise, denied.

16.     At all relevant times, Flyder was a duly authorized officer and/or agent of Tenant and legally authorized to bind Tenant to the terms and conditions of the Lease Agreement.

**ANSWER:**     Sprint admits that Ryder was a duly authorized officer and/or agent of the original tenant and legally authorized to bind the original tenant to the terms and conditions of the Lease Agreement. Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Otherwise, denied.

17.     The Lease Agreement was assigned to Tenant on September 9, 2011.

**ANSWER:**     Sprint admits that the Lease Agreement was assigned to Tenant on September 9, 2011.

18.     The Assignment was executed by Brian Jordan ("Jordan"), who was designated by Tenant as, the Director of Sprint Real Estate. See Exhibit 2.

**ANSWER:**     Sprint admits that the Assignment was executed by Brian Jordan whose title at the time of execution was Director of Sprint Real Estate. Otherwise, denied.

19.     At all relevant times, Jordan was a duly authorized officer and/or agent of Tenant and legally authorized to bind Tenant to the terms and conditions of the Lease Assignment.

**ANSWER:**     Sprint admits that Jordan was a duly authorized officer and/or agent of Tenant and legally authorized to bind Tenant to the terms and conditions of the Lease Agreement. Sprint refers to the Lease Assignment and the Lease Agreement for their complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement and/or the Lease Assignment. Otherwise, denied.

20.     On or about March of 2019, Landlord and Tenant entered into a written amendment to the Lease ("Lease Amendment"). (See Lease Amendment attached hereto as Exhibit 3.)

**ANSWER:**     Sprint admits the allegations of this paragraph.

21.     On or about March 25, 2020, Tenant exercised its option pursuant to the terms of the Lease Agreement to extend the Lease term ("Lease Extension Agreement"). (See Lease Extension Agreement attached hereto as Exhibit 4.)

**ANSWER:**     Sprint admits that on March 25, 2020, Sprint sent a letter to Landlord, a copy of which is attached as Exhibit 4 to the Complaint.  Sprint denies that it is appropriate to refer to such letter as the "Lease Extension Agreement," and accordingly will refer to it instead as the "Exhibit 4 Letter." Sprint refers to the Exhibit 4 Letter for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication. Otherwise, denied.

22.     Collectively, the terms of the Lease Agreement, Lease Assignment and Lease Extension Agreement (collectively the "Lease Documents") govern and control the respective contractual rights, duties and responsibilities of the parties pertaining to the Leased Premises.

**ANSWER:**     Sprint denies the allegations of this paragraph. Answering further, Sprint observes that this paragraph fails to reference the Lease Amendment.

23.     The Lease Agreement provided that, subject to the terms and conditions set forth in the Lease, Landlord would lease the Leased Premises to Tenant in exchange for the payment of rent and other expenses, charges, and costs.

**ANSWER:**     Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Sprint further denies the allegations of this paragraph because they fail to account for how the terms of the Lease Agreement are affected by the Lease Amendment. Otherwise, denied.

24.     The Lease Extension Agreement requires the Tenant to pay rent for the Leased Premises from April 1, 2020, through March 31, 2025, at the rate of $164,931 per year, which equates $13,744.25 per month. (See Lease Extension Agreement attached as Exhibit 4 at page 1.)

**ANSWER:**     Sprint denies that it is appropriate to refer to such letter as the "Lease Extension Agreement," and accordingly will refer to it instead as the "Exhibit 4 Letter." Sprint refers to the Exhibit 4 Letter for its complete and accurate contents and denies the allegations in

this paragraph to the extent they conflict with the language of such letter. Sprint further denies

that such letter requires any rent payments. Otherwise, denied.

25.    Tenant and Landlord agreed that Landlord would renovate the Leased Premises in a specified manner and permitted the Landlord twelve (12) months to complete the construction commencing on or about April 1, 2019.

**ANSWER:**    Sprint refers to the Lease Agreement and Lease Amendment for their

complete and accurate contents and denies the allegations in this paragraph to the extent they

conflict with the language of the Lease Agreement and/or Lease Amendment. Otherwise, denied.

26.    On or about April 21, 2020, Tenant sent a letter to Landlord claiming to be terminating their entire obligation under the Lease Documents due to Landlord's purported failure to complete the construction at the Building ("April 21, 2020 Purported Lease Termination Letter") by the target completion date. (See a copy of the April 21, 2020 Purported Lease Termination Letter attached hereto as Exhibit 5.)

**ANSWER:**    Sprint admits that on or about April 21, 2020, Sprint sent a letter to Landlord

terminating the Lease due to Landlord's failure to complete the construction at the Building, and

that a copy of such communication is attached as Exhibit 5 to the Complaint. Sprint refers to this

letter for its complete and accurate contents and denies the allegations in this paragraph to the

extent they conflict with the language of this communication. Otherwise, denied.

27.    The April 21, 2020, Purported Lease Termination Letter failed to take into account the global pandemic that began during construction causing substantial delays in all areas of the economy and society, and causing approximately a million deaths in the United States alone.

**ANSWER:**    Sprint denies the allegations of this paragraph.

28.    The construction industry was similarly greatly impacted by the global pandemic, causing substantial delays in production, materials, labor shortages, and new regulations regarding working conditions.

**ANSWER:**    Sprint denies that any impact referenced in this paragraph caused the

Landlord not to complete its work by any particular point in time, including April 1, 2020. Sprint

lacks knowledge or information sufficient to form a belief regarding what Landlord means by

"greatly impacted." Otherwise, denied.

29.     Landlord informed the Tenant of the delays and that they were beyond Landlord's control.

**ANSWER:**   Sprint admits that Landlord sent a letter to Tenant on or about April 24, 2020, which is attached in Exhibit 7 to the Complaint and which references certain "logistical delays."  Otherwise, denied.

30.     Delays caused by the COVID-19 pandemic were recognized across all aspects of society, impacting the global supply chain generally and the construction industry. (See communications from various companies attached hereto as Group Exhibit 6.)

**ANSWER:**   Sprint admits that Group Exhibit 6 to the Complaint attaches certain documents that purport to discuss COVID-19.  Sprint lacks knowledge or information sufficient to form a belief regarding what Landlord means by "Delays caused by the COVID-19 pandemic were recognized across all aspects of society, impacting the global supply chain generally and the construction industry." Otherwise, denied.

31.     On April 24, 2020, Landlord sent Tenant correspondence denying Tenant's purported basis to terminate the lease ("April 24, 2020 Landlord's Rejection of Tenant's Purported Lease Termination Lease"). (See April 24, 2020 Landlord's Rejection of Tenant's Purported Lease Termination Lease and attachments attached hereto as Exhibit 7.)

**ANSWER:**   Sprint admits that on April 24, 2020, Landlord sent Tenant correspondence, a copy of which is attached in Exhibit 7 to the Complaint.  Sprint refers to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of this communication.  Otherwise, denied.

32.     Landlord and Tenant addressed the potential risk that forces beyond Landlord's control could impact the completion of the construction at the Premises by agreeing to the inclusion of a *force majeure* provision in Paragraph 10 of the Lease Amendment, which provides in pertinent part as follows:

> Duration of Temporary Closure. Subject to Force Majeure (as defined in the initial Lease), if Landlord fails to complete Landlord's Work within 12 months of the Initial Close Date, Tenant shall be entitled to terminate this Lease upon thirty (30) days prior written notice to Landlord. If Tenant so elects to terminate this Lease, Landlord shall reimburse Tenant for Tenant's its Costs as set forth

in Paragraph 9 within 30 days of the effective date of the Lease termination.

(See Lease Amendment attached hereto as Exhibit 3 at Par. 10.)

**ANSWER:**    Sprint refers to the Lease Amendment for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Amendment.  Otherwise, denied.

33.    The Lease Agreement defines the term Force Majeure as follows:

15.6 FORCE MAJEURE. Whenever a period of time is provided in this Lease for either party to do or perform any act or thing, that party shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control or other causes beyond the reasonable control of said party, and if any of those events occurs, the time period shall be extended for the amount of time the party is delayed; provided that this Section shall not apply to Tenant's obligation to pay Rent, provide a security deposit, provide evidence of insurance required under this Lease, surrender the Premises when required, or deliver estoppel certificates.

(See Lease Agreement attached hereto as Exhibit 1, at Section 15.6.) (Emphasis added.)

**ANSWER:**    Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement.  Otherwise, denied.

34.    On or about January 30, 2020, the World Health Organization ("WHO") declared that a novel coronavirus known as SARS-CoV-2 or COVID-19 (hereinafter referred to as the "Coronavirus") was a Public Health Emergency of International Concern. Thereafter, on or about January 31, 2020, the United States Secretary of Health and Human Services ("HHS") declared a public health emergency under section 319 of the Public Health Service Act (42 U.S.C. § 247d) in response to the Coronavirus.

**ANSWER:**    Sprint admits the allegations of this paragraph.

35.    On or about March 9, 2020, Illinois Governor J.B. Pritzker issued a Gubernatorial Disaster Proclamation, finding that the Coronavirus was a "severe acute respiratory illness" and that the circumstances surrounding COV[D-19 constitute a public health emergency under the Illinois Emergency Management Agency Act.

**ANSWER:**    Sprint admits the allegations of this paragraph.

36.    On or about March 18, 2020, the Commissioner of Health of the City of Chicago issued a Shelter-in-Place order within the City of Chicago as a result of the Coronavirus. A few days later, on March 20, 2020, Governor Pritzker ordered all "non-essential businesses" to close.

**ANSWER:**    Sprint admits the allegations of this paragraph, except that Sprint lacks knowledge or information sufficient to form a belief regarding what Landlord means when purporting to quote from a portion of Governor Pritzker's March 20, 2020 order.

37.    The Coronavirus constitutes an act of God as contemplated by the Lease Documents, as acknowledged by the various emergency declarations and proclamations, and as referenced in Section 15.6 of the Lease, and later referenced in the Lease Amendment pertaining to Landlord's duties vis-à-vis timely completion of the construction at the Leased Premises.

**ANSWER:**    Sprint denies the allegations of this paragraph.

38.    The closure orders referenced above and other governmental restrictions and directives constitute governmental regulation or control, which prevented Landlord from completing the specified construction in the Lease Amendment on the schedule initially contemplated.

**ANSWER:**    Sprint denies the allegations of this paragraph.

39.    The global shift in logistics to transportation of primarily medical equipment and Personal Protection Equipment (hereinafter referred to as "PPE") was beyond the reasonable control of Landlord, who could not have reasonably anticipated the global Coronavirus pandemic at the time the Lease Amendment was entered into by the parties.

**ANSWER:**    Sprint admits that Landlord does not control a "global shift in logistics," but denies that Landlord could not have reasonably anticipated the matters alleged in this paragraph. Otherwise, denied.

40.    On April 28, 2020, Tenant responded to Landlord's letter incorrectly asserting that the COVID-19 response purportedly did not prevent the Landlord from completing the construction at the Leased Premises ("Tenant's April 28, 2022 Response"). (See Tenant's April 28, 2022 Response attached hereto as Exhibit 8.)

**ANSWER:**    Sprint admits that it responded to the Landlord's April 24, 2020 letter on April 28, 2020, and that Sprint's response is attached as Exhibit 8 to the Complaint. Sprint refers

to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication. Otherwise, denied.

41.    On May 8, 2020, Landlord responded to Tenant with a detailed list of all the delays Landlord had experienced up to that point due to the COVID-19 pandemic ("Landlord's May 8, 2020 Response"). (See Landlord's May 8, 2020, Response attached hereto as Exhibit 9.)

**ANSWER:**    Sprint admits that on May 8, 2020, Landlord responded to Tenant with certain information regarding delays experienced up to that point, and that Landlord's letter of that date is attached as Exhibit 9 to the Complaint. Sprint refers to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication. Otherwise, denied.

42.    On May 12, 2020, Tenant responded to Landlord's May 8, 2020 Response ("Tenant's May 12, 2020 Response"), continuing to improperly claim that Tenant was purportedly able to terminate the Lease Agreement and related agreements based upon Paragraph 10 of the Lease Amendment. (See Tenant's May 12, 2020 Response attached hereto as Exhibit 10.)

**ANSWER:**    Sprint admits that on May 12, 2020, Sprint responded to Landlord, and that such letter is attached as Exhibit 10 to the Complaint. Sprint refers to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication. Otherwise, denied.

43.    On May 18, 2020, Landlord once again responded to Tenant by clearly stating that the pandemic was an act of God and Landlord was working diligently to finish the construction at the Leased Premises ("Landlord's May 18, 2020, Response"). (See Landlord's May 18, 2020, Response attached hereto as Exhibit 11.)

**ANSWER:**    Sprint admits that on May 18, 2020, Landlord sent a letter to Sprint, and that such letter is attached as Exhibit 11 to the Complaint. Sprint refers to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication. Otherwise, denied.

44.    On May 20, 2020, Tenant sent a letter to Landlord demanding access to their personal ("Tenant's May 20, 2020 Response") [sic]. (See Tenant's May 20, 2020 Response attached hereto as Exhibit 12.)

**ANSWER:**     Sprint admits that on May 20, 2020, it sent a letter to Landlord, and that such letter is attached as Exhibit 12 to the Complaint.  Sprint refers to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication.  Sprint lacks knowledge or information sufficient to form a belief regarding what Landlord means by "demanding access to their personal." Otherwise, denied.

45.     On May 26, 2020, Landlord responded to Tenant stating again inter alia that Tenant was not authorized to terminate its duties under the Lease Documents, but offering to work with the contractors to facilitate Tenant gaining access to its property ("Landlord's May 26, 2020 Response"). (See Landlord's May 26, 2020 Response attached hereto as Exhibit 13.)

**ANSWER:**     Sprint admits that on May 26, 2020, Landlord sent a letter to Sprint, and that such letter is attached as Exhibit 13 to the Complaint.  Sprint refers to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication.  Otherwise, denied.

46.     On June 16, 2020, Landlord completed the construction and tendered the Leased Premises back to Tenant ("Landlord's June 16, 2020 Notice of Completion of Construction"). (See Landlord's June 16, 2020 Notice of Completion of Construction attached hereto as Exhibit 14.)

**ANSWER:**     Sprint admits that on June 16, 2020, Sprint received a letter from Landlord, and that such letter is attached as Exhibit 14 to the Complaint.  Sprint refers to this communication for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the communication. Sprint lacks knowledge or information sufficient to form a belief as to the state of the construction on June 16, 2020.  Otherwise, denied.

47.     Tenant's reliance upon the de minimis delay in the completion of the construction at the Leased Premises referenced in Tenant's April 28, 2022 Response and prior correspondence was a mere pretext to purportedly permit the Tenant to avoid Tenant's obligations under the Lease Documents and not a valid basis to avoid its contractual obligations to Landlord.

**ANSWER:**     Sprint denies the allegations of this paragraph.

48.     Tenant's true motivation for its reliance upon the de minimis delay in the completion of the construction at the Leased Premises as a purported basis to avoid Tenant's obligations under the Lease Agreement and Lease Documents was for commercial reasons unrelated to any purported impact the *de minimis* delay in the completion of the construction had upon Tenant.

**ANSWER:**     Sprint denies the allegations of this paragraph.

49.     Notwithstanding Tenant's reliance upon the purported delay in completion of the construction in an attempt to avoid its legal obligations under the Lease Documents, Tenant is contractually obligated pursuant to the Lease Documents to pay rent as specified therein through the end of the specified lease term of March 31, 2025.

**ANSWER:**     Sprint denies the allegations of this paragraph.

50.     Tenant, without due cause or valid justification, has improperly claimed a purported basis to terminate the Lease Agreement and Lease Documents and has improperly failed to tender the rent specified therein when due and payable.

**ANSWER:**     Sprint denies the allegations of this paragraph.

51.     The Lease Agreement expressly states in Section 9.1 in pertinent part as follows:

Any of the following shall be deemed an Event of Default:

(iv)     Tenant defaults in the payment of any Rent and the default continues for more than 5 business days after notice; or Tenant ceases operation during the first Lease Year, or Tenant fails to provide the insurance as required under Section 11.2; or Tenant does not cure any other default which is amenable to cure within 30 days after notice of default.

(See Lease Agreement attached hereto as Exhibit 1.)

**ANSWER:**     Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement.  Otherwise, denied.

52.     Section 15.12 of the Lease Agreement states as follows:

If during the Term or afterwards, either party institutes an action, proceeding or counterclaim against the other relating to this Lease, or default, the unsuccessful party shall reimburse the successful party for the total amount of court costs, expenses and reasonable attorneys' fees of the party waiving any statute, rule of law or public policy to the contrary. The parties agree to confirm this agreement in writing at the start of the action,

proceeding or counterclaim. This Section 15.12 shall survive the expiration or termination of this Lease.

(See Lease Agreement attached hereto as Exhibit 1.)

**ANSWER:** Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Otherwise, denied.

53. Tenant has breached the Lease Documents by failing to pay rent when due.

**ANSWER:** Sprint denies the allegations of this paragraph.

54. Tenant is in default of the Lease Documents.

**ANSWER:** Sprint denies the allegations of this paragraph.

55. Landlord has fully performed its contractual obligations to the Tenant pursuant to the Lease Documents.

**ANSWER:** Sprint denies the allegations of this paragraph.

56. Section 9.2 of the Lease Agreement provides that in the event of default, Landlord may accelerate the rent that is due for the term of the Lease Documents and all such rent shall be immediately due and payable to Landlord; and or pursue any other remedy which may be available to Landlord at law, in equity or hereunder. (See Lease Agreement attached hereto as Exhibit 1.)

**ANSWER:** Sprint refers to the Lease Agreement for its complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Answering further, Sprint states that Section 9.2 of the Lease Agreement does not address acceleration of rent. Otherwise, denied.

57. The Lease Agreement and related Lease Documents provide that Landlord shall be awarded all of its reasonable attorney's fees in the event it is forced bring an action to enforce its rights following Tenant's default.

**ANSWER:** Sprint refers to the Lease Agreement and related Lease Documents for their complete and accurate contents and denies the allegations in this paragraph to the extent they conflict with the language of the Lease Agreement. Otherwise, denied.

58. As a direct and proximate result of Tenant's breach of the Lease Agreement and related lease documents, Landlord has suffered damages of no less than $638,598.79 owed to Landlord.

**ANSWER:** Sprint denies the allegations of this paragraph.

59. Accordingly, as a direct and proximate result of Tenant's unjustified default and breach of its duties under the Lease Documents, Landlord is due from Tenant no less than $638,598.79 in unpaid rent and related charges fully accelerated to date of the filing of this action. (See Exhibit 15.)

**ANSWER:** Sprint denies the allegations of this paragraph.

60. As a direct and proximate result of Tenant's breach of its contractual duties and obligations, Landlord has sustained damages in the amount of $638,598.79 together with prejudgment interest pursuant to the Illinois Interest Act, 815 ILCS 205/2, at the rate of 5% per annum from the date of acceleration of the rent until all sums due Landlord are paid in full, together with the court costs Tenant has incurred to bring this action.

**ANSWER:** Sprint denies the allegations of this paragraph.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (FAILURE TO MITIGATE)

1. Landlord had years to re-let the Leased Premises after it became aware of the fact that Sprint was not going to retake possession.

2. During such time period, Landlord failed to re-let the Lease Premises.

3. Given such failure, despite the passage of time, and taking into account the existing circumstances, Landlord failed to take reasonable or diligent efforts to mitigate its alleged damages.

4. Landlord accordingly cannot recover any portion of its damages that it could have avoided or reduced through reasonable efforts or diligence.

## SECOND AFFIRMATIVE DEFENSE
### (WAIVER)

1. Landlord was aware of Sprint's intention to terminate the lease no later than April 21, 2020.

2. Landlord was aware of its alleged rights to rent payments since such time, and before.

3. Landlord was aware of the fact that it was not receiving rent payments from Sprint.

4. Despite Landlord's belief that the lease was not rightfully terminated, Landlord took no action demanding payment of rent or fulfillment of Tenant's other duties under the Lease Documents.

5. Although the Complaint contains many references to the parties' correspondence, conspicuously absent from Landlord's allegations and the exhibits attached to the Complaint are instances of Landlord seeking to enforce its alleged lease rights to collect rent or instances of Landlord demanding the same.

6. For example, the Complaint makes no reference to any notice of default from Landlord to Sprint, such as for failure to pay rent when allegedly due. In fact, Landlord never gave notice of any default to Sprint for non-payment of rent.

7. Landlord's conduct in failing to pursue its alleged rights for a period of nearly three years, between purporting to return the premises to Sprint and the filing of this suit, acted as a waiver of Landlord's rights.

### THIRD AFFIRMATIVE DEFENSE
### (ESTOPPEL)

1.     Landlord was aware of Sprint's intention to terminate the lease no later than April 21, 2020.

2.     Despite Landlord's belief that the lease was not rightfully terminated, Landlord took no action demanding payment of rent or fulfillment of Tenant's other duties under the Lease Documents.

3.     Instead, as Landlord has alleged in the Complaint, Landlord disputes that the Lease Agreement was ever terminated. (See, for example, Paragraphs 31 and 45 of the Complaint.) Landlord has disputed such termination all the way back to April 2020. (*Id.*)

4.     Landlord's denial that the Lease was terminated is inconsistent with Landlord's claim now that it has a right to accelerate the full rent due over any remaining lease term, because Landlord may only accelerate rent following its termination of the lease pursuant to an Event of Default. (Lease Agreement, 9.1(B).)

5.     Landlord's position regarding non-termination of the lease is inconsistent with its claim for accelerated rent.

6.     Moreover, as evidenced by its conduct now in pursuing this action, Landlord must have known for years that it would pursue Sprint for the full amount of rent over a five-year period. Landlord concealed such intentions for nearly three years.

7.     It was reasonable for Sprint to rely on Landlord's silence as an indication that Landlord did not believe it had a right to pursue Sprint for accelerated rent.

8.     Sprint's reliance on such silence was to its detriment. Had Landlord timely issued a default notice or terminated the lease following an alleged Event of Default and then sought to

accelerate rent in a timely manner, Sprint could have taken actions years ago in response to such matters.

9.      Landlord accordingly is estopped from recovering damages.

### FOURTH AFFIRMATIVE DEFENSE
### (FAILURE OF CONDITION PRECEDENT)

1.      Under the Lease Agreement, Landlord may only accelerate rent upon the termination of the Lease Agreement by Landlord following an Event of Default. (Lease Agreement, 9.1(B).)

2.      Under Section 9.1(A)(iv) of the Lease Amendment, non-payment of rent only becomes an Event of Default if it continues for more than 5 business days after notice.

3.      However, Landlord never provided Sprint with a notice of default for non-payment of rent.

4.      Therefore, Landlord failed to fulfill the conditions precedent to an Event of Default, which in turn means that Landlord failed to fulfill the conditions precedent to accelerate rent upon termination of the Lease Agreement.

5.      Because Landlord failed to perform a condition precedent, Landlord cannot recover any portion of its damages that arise from acceleration of rent.

## COUNTERCLAIMS

Defendant SprintCom, LLC, f/k/a SprintCom, Inc., by and through its attorneys, Barack Ferrazzano Kirschbaum & Nagelberg LLP, brings this counterclaim against Gold Coast Flats, LLC for offset under 735 Ill. Comp. Stat. § 5/2-608, and in support states as follows:

**NATURE OF THE DISPUTE**

1.       This dispute arises from the terms of a Lease Amendment entered into by Gold Coast Flats, LLC ("Landlord") and SprintCom LLC, f/k/a SprintCom, Inc. ("Sprint" or "Tenant") on or about March 2019.

2.       Under the terms of the Lease Amendment, Sprint is entitled to more than a year's worth of rent credits and other payments as compensation for Sprint's voluntary closure of its operations at the Leased Premises to permit Landlord to complete a sizeable renovation of the building located at 1201 North Clark Street.

3.       To date, Landlord has not made the required payments under the terms of the Lease Amendment and must be made to pay damages in the amount required under the Lease Amendment and related Lease Documents.

**THE PARTIES**

4.       Landlord is an Illinois-registered limited liability company.

5.       Sprint is a Kansas limited liability company.

6.       As alleged in the Notice of Removal filed by Sprint (Dkt. 1), Landlord is a citizen of Illinois, and Sprint is a citizen of Delaware and Washington State, for purposes of 28 U.S.C. § 1332.

**JURISDICTION AND VENUE**

7.       This action was removed to this Court on June 16, 2023, pursuant to 28 U.S.C. §§ 1441 and 1446. (Dkt. 1).

8.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1367(a). The counterclaim raised below forms part of the same case or controversy as the claims over which the Court has original jurisdiction under 28 U.S.C. § 1332(a).

9.      Venue is proper in this District under 28 U.S.C. § 1391(b) because the Leased Premises are located in this District.

## FACTS

10.      On or about November 16, 2009, Landlord entered into a Lease Agreement with Clearwire Communications, LLC, regarding retail space located at 1201 North Clark Street ("the Premises").

11.      The Lease Agreement provided for an Initial Lease Term of 10 years.

12.      Under the Lease Agreement, Fixed Minimum Rent for years 6-10 of the Initial Lease Term was set at $12,217 per month, and $146,606 annually.

13.      On or about September 9, 2011, Clearwire Communications, LLC assigned the lease to Sprint.

14.      On or about March 2019, Sprint and Landlord entered into a written amendment to the Lease Agreement ("Lease Amendment").

15.      At the time of the Lease Amendment's execution, Sprint was about to enter year 10 of the Initial Lease Term.

16.      Under the Lease Amendment, Sprint agreed to close its operations at the Premises to permit Landlord to complete renovations on the building located at 1201 North Clark Street.

17.      The Lease Amendment provided for the following regarding Tenant's rent and other payment obligations during the closure:

> 2.    Tenant Rent During Closure: During the Temporary Closure Period, Tenant and Landlord agree to suspend Tenant's requirement to pay Fixed Minimum Rent and Tenant's Pro Rata Share of Operating Expenses and Insurance Premiums.

> 3.    Rent Abatement During Closure: Landlord agrees to credit Tenant 1.25 Months of Fixed Minimum Rent for every Month during the Temporary

20

Closure Period and until all scaffolding on and around the Premises is completely removed (the "Abatement"). The credit amount for partial months will be prorated by dividing the number of days closed (numerator) by the total number of days in that certain month (denominator).

. . .

9. Tenant Reimbursement for Costs: In the event any reasonable costs are directly borne by Tenant, in relation to the temporary closure and re-opening of the Premises as evidenced by Tenant's presentation to Landlord of invoices and other evidence of the amount of such out of pocket costs (the "Costs"), Tenant shall have the right to offset the Costs from the Fixed Minimum Rent until Tenant has recouped it's [sic] Costs. In the event the Lease Term expires, or is sooner terminated, before Tenant has recuperated its Costs, Landlord will make payment to Tenant of the outstanding balance within thirty (30) days of expiration of the Term.

18.   The Lease Amendment further provided for a $5,000 credit related to Sprint's removal and reinstallation of business signage.

19.   Sprint closed its operations at the Premises on or about April 1, 2019.

20.   Under the Lease Amendment, Landlord had twelve (12) months to complete the renovations and return possession of the premises to Sprint, meaning that Landlord was to complete the construction on or before April 1, 2020.

21.   In the event the renovations were not complete on or before April 1, 2020, Sprint had a right to terminate the Lease.

22.   Landlord did not complete the construction by April 1, 2020.

23.   On or about April 21, 2020, Sprint exercised its right to terminate the Lease Agreement and notified Landlord that the Lease Agreement would be terminated as of May 31, 2020.

24.   To date, Landlord has failed to provide Sprint with any payment related to the Rent Abatement, Costs, or signage under the Lease Amendment.

21

## COUNT I
### (SETOFF OR OFFSET)

25.     Sprint realleges and incorporates paragraphs 1–24 as if set forth fully herein.

26.     The Lease Agreement provides for certain categories of credits or other amounts that are due to Sprint regardless of the fact that the Lease Agreement was terminated in 2020, as well as certain categories that may only be recoverable as deductions against a claim by Landlord. Such amounts collectively include, without limitation, credits for rent abatement under the Lease Amendment, a signage credit, and any payments Sprint made during any abatement period.

27.     Sprint is entitled to certain amounts owed under the provisions of the Lease Amendment regardless of the outcome of Landlord's claim.

28.     In the alternative, Sprint is entitled to offset, against any damages proven by Landlord, any credit or other amounts due to Sprint.

29.     Landlord acknowledges that it owes certain credits to Sprint under the Lease Amendment. (Complaint, Exhibit 15.)

WHEREFORE, Sprint requests that the Court enter judgment in its favor and against Landlord on the above counterclaim, award Sprint damages in an amount to be determined and grant Sprint any other relief the Court deems just, including interest and attorneys' fees and expenses.


Date:  October 25, 2023                    Respectfully submitted,

                                           By:____/s/ Jack O. Snyder____


                                           Steven J. Yatvin
                                           steven.yatvin@bfkn.com
                                           Jack O. Snyder
                                           jack.snyder@bfkn.com
                                           Murphy Olivia Glass

olivia.glass@gmail.com
BARACK FERRAZZANO KIRSCHBAUM
      & NAGELBERG LLP
200 W. Madison St., Ste. 3900
Chicago, IL 60606
Firm No. 43707
(312) 984-3100 (phone)
(312) 984-3150 (fax)

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of October 2023, I caused a true and correct copy of the foregoing document to be filed with the Court's CM/ECF system, which provides notice to all counsel of record via electronic mail.


/s/  *Jack O. Snyder*

ATTORNEY FOR DEFENDANT SPRINTCOM
LLC F/K/A SPRINTCOM, INC.